HEALY v. BACKUS, Immigration Com'r. †

(Circuit Court of Appeals, Ninth Circuit. March 18, 1915.)

No. 2436.

1. ALIENS ⊂⊃54—EXCLUSION—PROCEEDINGS.

An alien cannot object to the proceedings for his removal on the ground that the warrant of arrest is issued on a mere application stating that the alien was likely to become a public charge because of the prejudice against his race, that it was not accompanied by the things required by the rules, and that there was a variance between the application and the warrant for arrest, since the proceedings are summary in their nature, no pleadings are necessary, and it is only required that the alien be given sufficient information of the charge against him to enable him to offer testimony at the hearing, and that the proceedings should be manifestly fair and impartial and involve no abuse of discretion.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ⊂⊃54.]

2. ALIENS ⊂⊃54—EXCLUSION—PROCEEDINGS.

In proceedings for the exclusion of aliens, where, after they had introduced evidence in their behalf, the government was permitted to introduce further evidence, but the aliens were given notice of such evidence, permitted to examine it, and to introduce further evidence thereafter to refute it, the proceedings, while informal, were fair to the aliens, and show no abuse of discretion.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ⊂⊃54.]

3. ALIENS ⊂⊃44—EXCLUSION—RULES.

Under Immigration Act Feb. 20, 1907, c. 1134, § 22, 34 Stat. 898 (Comp. St. 1913, § 959), requiring the Commissioner General of Immigration, under direction of the Secretary of Labor, to establish rules to carry out the act, that officer had authority to promulgate the provision of rule 14, that an alien who was admitted to the Philippines after declaring his intention of subsequently coming to the mainland, and who had received his certificate from the collector of customs there, may be re-examined as to his fitness on arrival on the mainland, since it may be that certain immigrants would not be in danger of becoming public charges in the Philippines, but would be in danger on the mainland, where conditions are so dissimilar.

[Ed. Note.— For other cases, see Aliens, Cent. Dig. §§ 102–104; Dec. Dig. ⊂⊃44.]

4. ALIENS ⊂⊃40—CONSTITUTIONAL LAW ⊂⊃92—EXCLUSION—VESTED RIGHT.

An alien, who had landed in the Philippines after declaring his intention subsequently to proceed to the mainland, at a time when the rules provided that a certificate be given him by the collector of customs, which entitled him to land in the United States without further examination, had no vested right under such certificate which prevented the Commissioner General from amending the rules before the alien reached the mainland, so as to permit a further examination there as to his fitness.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 100; Dec. Dig. ⊂⊃40; Constitutional Law, Cent. Dig. §§ 174, 175, 178–180, 207, 225–227, 237; Dec. Dig. ⊂⊃92.]

---

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

† Rehearing denied May 10, 1915.

5. ALIENS ⬌54—EXCLUSION—ADMISSIBILITY OF EVIDENCE.

In proceedings before the immigration officers for the exclusion of Hindoo immigrants, evidence in the form of affidavits, interviews, and newspaper clippings, showing the feeling toward the Hindoos and the condition of the labor market generally, and especially as regard Hindoos, is admissible to aid in determining whether the immigrants are likely to become a public charge, though they would not be admissible in a court of law.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ⬌54.]

6. ALIENS ⬌54—EXCLUSION—EFFECT OF DECISION.

Findings of immigration officers as to admission of alien immigrants is final and conclusive, in the absence of unfairness or abuse of discretion.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. ⬌54.]

Appeal from the District Court of the United States for the First Division of the Northern District of California; M. T. Dooling, Judge.

Two cases are comprised by the record, one being an application by Timothy Healy for a writ of habeas corpus in behalf of Bhagat Singh and 11 others, and the other an application in behalf of Sundar or Sandu Singh and 9 others, against Samuel W. Backus, as Commissioner of Immigration at the Port of San Francisco. The cases are known in the court below as Nos. 15,479 and 15,480. An order to show cause was issued, and upon a hearing the writ was denied, in each case, and from the judgment rendered an appeal is prosecuted to this court. Affirmed.

The petitioners are Hindoos from India and subjects of Great Britian. They first entered the Philippine Islands, where they were given certificates of admission by the officers who supervise immigration under the Department of War in that territory. After remaining in the Islands for a time they took passage to San Francisco, having been duly furnished with certificates as evidence of their entry at an insular port. On their arrival here they were arrested upon warrants issued by the Secretary of Labor at Washington, D. C. It was alleged in the petition for the warrant that they were "likely to become public charges because they are Hindoo laborers, and that there exists a strong prejudice against them in this locality." The warrant of deportation issued upon a finding made by the Secretary of Labor to the effect that the petitioners are members of the excluded classes, in that they were persons likly to become public charges at the time of their entry into this country. The record does not show what is stated in the warrant of arrest, as no copy is contained in the transcript.

The petitioners further allege that they were denied a fair hearing by the Commissioner of Immigration and the Secretary of Labor, in that they were, while detained under arrest, examined, but that they were not informed of the charges or allegations made against them, or of the issuance of the warrants for their arrest, until the conclusion of such examination; that they, the petitioners, were the only persons examined, and no other testimony of any kind or character was taken or offered of which petitioners had any notice or knowledge; that thereafter petitioners offered and filed with the Commissioner of Immigration affidavits of employers of labor, who deposed that ample opportunities existed for Hindoos to obtain employment, that they do not know of a single Hindoo in America who has been or become a public charge, and that they know of no prejudice among employers of labor against this class of aliens; that thereupon the Commissioner informed the petitioners that the cases were closed, and invited their attorneys to file a brief, if they so desired, and petitioners were informed that the cases would be at once sent to the Secretary of Labor for decision and judgment; that at said time

⬌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

there was no evidence to support the charge that petitioners had been or would ever become, or would be likely to bcome, public charges; and that, notwithstanding these proceedings, petitioners were later, namely, on September 25, 1913, informed by an immigration inspector that the record had not been closed, but that ever since the previous announcement it had been open, and had been and was being added to by the Commissioner of Immigration, of all of which petitioners had no previous notice or knowledge. And it is further alleged that the Commissioner had detailed an inspector to canvass people of the state of California for evidence to support the charges made against petitioners; that no evidence was obtained, but that there were placed in the reopened record certain affidavits, interviews, and letters, given and written by persons unknown to petitioners, and without petitioners being accorded the opportunity to cross-examine such persons giving the affidavits, interviews, and letters; that petitioners were on the date last mentioned informed of the reopening of the record, and their counsel were informed that they would be at liberty to make such further counter showing, and to file such additional briefs as they desired, but that petitioners entered their protest against the procedure thus had and adopted. It is then further alleged that the findings of the Secretary of Labor were made and the warrant of deportation was issued without any competent evidence in support thereof having been submitted for the inspection of petitioners, and that the Secretary of Labor issued said warrant of deportation through manifest abuse of discretion as alleged.

The return of the officer having petitioners in charge shows that each of said petitioners was examined separately and without reference to the cases of the others, and that full opportunity was given to each, any, and all of such aliens, and his and their attorneys, to submit any evidence he or they desired; that the affidavits of employers of labor referred to in the petition were filed in behalf of said petitioners collectively, and pertained to Hindoos generally as a people or race, but denies the alleged announcement that the case had been closed, or at that stage of the proceedings that no evidence had been submitted in support of the charges, or that petitioners were informed by an inspector that the record had not been closed, or had ever since been open or was being added to by the Commissioner of Immigration, or that petitioners had no notice or knowledge of the record being kept open. The return further shows that the affidavits, interviews, and letters referred to in the petition were introduced in the record by the Commissioner of Immigration because of the previous introduction therein of the said employers of labor affidavits by petitioners, as shown by the petition, and for the purpose of rebutting the general and circumstantial allegations contained in said last-mentioned affidavits with evidence of a like circumstantial nature, but denies that petitioners and their attorneys entered protest against the procedure adopted by the Department of Labor in reopening the record, and further alleges that it was not until the final brief submitted by the attorneys in behalf of petitioners that any protest was made to the introduction of said additional evidence by the Commissioner, and that accompanying the brief further affidavits in behalf of petitioners were offered containing matter relating to Hindoos generally as a race, which were accepted and placed in the record and submitted to the Department of Labor for consideration.

John L. McNab and Timothy Healy, both of San Francisco, Cal., for appellant.

John W. Preston, U. S. Atty., and Walter E. Hettman, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). [1] Appellants complain that the warrant of arrest was issued on the mere application that it be issued on the ground that petitioners "were likely to become public charges because they were Hindoo laborers.

and that there exists a strong prejudice against them in this locality"; that the application was not attended with the things required by immigration rule 22; and that there was a fatal variance between the application and the warrant of arrest. The objections go rather to the regularity of the proceedings for the arrest and examination of petitioners than to the substance of the inquiry. The proceedings are by nature summary, and necessarily so. No formal charge or pleadings are required, nor does the doctrine of variance have application, provided the alien be given sufficient information of the acts relied upon to bring him within the excluded classes to enable him to offer testimony at the hearing directed to be had by the warrant of arrest. The cardinal and vital conditions that should attend such a proceeding are that it should be manifestly fair and impartial, and that there be no abuse of the discretion committed to the officers having charge and control thereof. In re Jem Yuen (D. C.) 188 Fed. 350; United States ex rel. Reinmann v. Martin (D. C.) 193 Fed. 795; United States v. Uhl, 211 Fed. 628, 128 C. C. A. 560; Low Wah Suey v. Backus, 225 U. S. 460, 468, 32 Sup. Ct. 734, 56 L. Ed. 1165.

[2] The record discloses a controversy touching the effect of the evidence adduced prior to August 20, 1913, and whether petitioners were informed by the Commissioner of Immigration that the record was closed and ready for submission to the Secretary of Labor for final determination. As to the latter, if it be that petitioners were so informed, it is manifest that the record was not so closed, and, further testimony having been adduced on the part of the immigration officers, the petitioners were in the course of the proceedings informed of the fact and advised that they were at liberty to examine the testimony so adduced and to take copies thereof, and that counsel would be permitted to file additional briefs if they so desired. Due acknowledgment of such information was made by counsel, and some time later a final brief was submitted, and with it were tendered further affidavits in behalf of petitioners, and some letters containing matter relating to Hindoos generally as a people or race, which were accepted and submitted to the Department of Labor for consideration. These facts show that, although the proceedings were concededly informal and summary in character, the petitioners were fairly dealt with, and every opportunity was afforded them for concerting whatever defense they might have had against deportation, and of presenting the same to the proper officers for consideration prior to any decision rendered in the premises. Nor do we think that, considering the entire record, the officers having the matter in hand were chargeable with any abuse of discretion in pursuing the procedure adopted. The effect of the evidence will be later considered as a whole.

[3] Another question involved is the right of the petitioners to land at San Francisco, having been allowed to land at Manila, in the Philippines, and coming with proper certificates entitling them to proceed to the mainland. This depends upon the rules of the Department of Labor and the power of the Department to prescribe them. By the act of Congress of February 20, 1907 (34 Stat. 898, c. 1134, § 1 [Comp. St. 1913, § 4242]), and acts amendatory thereto, "persons likely to become a

public charge" are excluded from admission into the United States. By section 20 (section 4269) it is provided:

"That any alien who shall enter the United States in violation of law, and such as become public charges from causes existing prior to landing" shall be deported "at any time within three years after the date of his entry into the United States."

Thus the exclusion is of persons likely to become public charges. But if entry has been made, and aliens have become public charges from causes existing prior to landing, they may be deported within three years after entry.

By section 22 (Comp. St. 1913, § 959) the Commissioner General of Immigration is, under the direction of the Secretary of Labor, given charge of the administration of all laws relating to the immigration of aliens into the United States, and it is provided that:

"He shall establish such rules and regulations, prescribe such forms of bond, reports, entries, and other papers, and shall issue from time to time such instructions, not inconsistent with law, as he shall deem best calculated for carrying out the provisions of this act and for protecting the United States and aliens migrating thereto from fraud and loss."

In pursuance of the duties thus imposed upon the Commissioner General, he promulgated certain rules and regulations governing the admission of aliens into this country, and among them rule 14, which, as it pertains to the Philippine Islands, provides:

Subdivision 1. That aliens arriving in the Philippines bound for the continent shall be inspected and given a certificate signed by the insular collector of customs at Manila showing fact and date of landing.

Subdivision 2. That aliens who having been manifested bona fide to the Philippines, and having resided there for a time, signify to the insular collector of customs at Manila an intention to go to the continent shall be furnished such certificate as evidence of their regular entry at an insular port.

Subdivision 3. That aliens applying at continental ports and surrendering the certificate above described shall, upon identification, be permitted to land, provided it appears that at the time such aliens were admitted to the Philippines they were not members of the excluded classes or likely to become public charges if they proceeded to the mainland.

Subdivision 4. That if such aliens fail to present the certificate it shall be presumed that they were not examined when they entered the Philippines, and they shall be arrested on the ground of entry without inspection, and such other grounds, if any, as may be found to exist. And further, if it is found in accordance with subdivision 3 that such aliens were at the time of entry to the Philippines members of the excluded classes or likely to become public charges if they proceeded thence to the mainland, they shall be arrested in accordance with rule 22 on either or both grounds.

These provisions superseded others on the same subject, which, among other things, provided that aliens applying at continental ports and surrendering their certificate as evidence of admission to the insular port shall, upon identification, be admitted without further examination. The amended rules were adopted subsequently to the time some of petitioners landed in the Philippines, but prior to their departure for the United States. It will be seen that the previous rule 14 treated aliens once admitted to the Philippines as entitled to admission to the mainland upon identification without further examination. The amended rule discards the idea that aliens once admitted to insular

possessions are entitled as of course to admission to the continent without further examination, and has injected the thought that aliens might be likely to become a public charge on the mainland when such likelihood would not exist as to them in insular possessions, and hence they are subjected to further examination upon their entry at continental ports.

It might well be that aliens would be likely to become public charges on the mainland when such would not be the case with them were they to remain in the insular possessions, such as Porto Rico, Hawaii, or the Philippines, where the labor and climatic conditions are essentially different, where the habits of the people, their modes and standards of living, and their environment are in a marked degree dissimilar. It is apparent that the same tests for discovering and determining the likelihood of becoming public charges would not be as applicable or as efficacious in the one case as in the other. So that there exists a potent reason for the adoption of the rule requiring additional examination where aliens have been manifested in these insular possessions and go on certificate to the mainland.

The question involved is not whether, when an alien is once admitted into or has entered the United States, he may not be deported as a person likely to become a public charge; nor is it one of class or race discrimination, as in the case of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, but whether the Commissioner General of Immigration is empowered to adopt rules for an alien's admission to the insular possessions, and then require further examination, if he proceeded to the mainland, as a test of his right to enter the continent. The power of the Commissioner General for adopting rules and regulations for carrying the provisions of the Immigration Act into effect is very broad, and if it be as we have said, it might well be that persons would not be likely to become public charges in insular possessions, or certain of them, while they would be likely to become public charges on the continent, why is it not a reasonable and perfectly natural exercise of that power to admit such persons to the insular possessions on condition that if they proceed to the mainland they must submit to further examination as to their likelihood of becoming public charges in the latter country? It is but the application and enforcement of the act according to the conditions found to exist, and is not, we think, beyond the authority conferred by Congress. The admission to the insular possessions under the amended rule 14 is not an admission generally, but only qualifiedly and conditionally, so that applicant's exclusion from the continent may yet proceed upon the ground that he is one of the excluded classes, and not upon the ground of having, after entry, become a public charge for causes theretofore existing after unqualified admission.

[4] This is so as it pertains to the validity of rule 14 as amended. Some of these petitioners, as previously stated, were admitted to the Philippines prior to the adoption of the amendment, and, having been so admitted, on signifying their intention of coming to the continent they were, under the previous rule, entitled to a certificate as evidence of their regular entry, which certificate would entitle them to be ad-

mitted at continental ports without further examination. The fact remains, however, that their admission was only to the Philippine possessions, and not to the continent. The certificate to be furnished them of their regular admission there constituted evidence of their right to be admitted to the mainland. Being merely evidentiary in character, the Commissioner General was empowered, under his authority for administering the law, to establish other and different standards of proofs within reasonable limits of their right to admission here. Such new and revised regulation, we are impressed, was not a violation therefore of any vested rights of the petitioners, and the inquiry would still remain whether they would be likely to become public charges on the continent, having relation under the amended rule to the time of their admission to the Philippines.

[5] The next and most vital question to be examined is whether there was any pertinent and competent testimony adduced by which to support the findings of the Department of Labor requiring deportation of petitioners. The petitioners were each examined as to their physical conditions and property holdings, and also as to their purposes in coming to the United States and how they came. It developed that some of them were afflicted with a disorder commonly called hookworm, and some were otherwise impaired in health; but the larger number of them, so far as present examination disclosed, were apparently free from disease. Farther than this, there was a vast amount of testimony adduced in the form of affidavits, interviews, letters, and newspaper clippings showing the state of the public mind in California towards the Hindoos as a race or class, the condition of the labor market in general, and especially as it related to Hindoos, the desirability or nondesirability among employers for their employment, and the demand or lack of any considerable demand for labor of the kind. The production of this class of testimony was not only indulged in by the inspectors, but also by the petitioners themselves; they having first offered a number of affidavits for the purpose of establishing the condition of the labor market and the desirability for the employment of Hindoos. So, also, did they introduce, as we have seen, certain other affidavits and letters in rebuttal.

[6] The findings of executive officers touching the admission of aliens into this country are, under the Immigration Act, deemed to be final and conclusive, and such is the uniform holding of the courts. One of the latest expressions of the Supreme Court on the subject is found in Tang Tun v. Edsell, 223 U. S. 673, 675, 32 Sup. Ct. 359, 361, 56 L. Ed. 606, where it is said:

"And if it does not affirmatively appear that the executive officers have acted in some unlawful or improper way and abused their discretion, their finding upon the question of citizenship must be deemed to be conclusive and is not subject to review by the court."

And in a still later case, Low Wah Suey v. Backus, supra, the court says:

"In order to successfully attack by judicial proceedings the conclusions and orders made upon such hearings, it must be shown that the proceedings were manifestly unfair, that the action of the executive officers was such as to prevent a fair investigation, or that there was a manifest abuse of discretion.

committed to them by the statute. In other cases the order of the executive officers within the authority of the statute is final."

See, also, United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040, and Chin Yow v. United States, 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. 369.

Such findings, however, are as to matters of fact, and it follows that, in order that they may have the conclusive effect that the statute accords them, there must be some evidence tending to their support; otherwise, there would be error of law on account of which the courts would entertain jurisdiction. United States v. Williams, 200 Fed. 538, 118 C. C. A. 632. This court has in a recent case, involving the deportation of Russian subjects, of marked analogy to the one at bar as it respects the character of the evidence adduced and its bearing upon the issues presented, sustained the decision of the administrative officers. White v. Gregory, 213 Fed. 768, 130 C. C. A. 282. It was there observed that:

"It [the court] will not inquire into the sufficiency of probative facts or consider the reasons for the conclusions reached by the officers."

And in another case from the Second Circuit, decided about the same time, the court reached the same conclusion. United States v. Uhl, 215 Fed. 573, 131 C. C. A. 641. This case also involved the deportation of certain Russian subjects seeking to land at the port of New York. The court there commenting upon the nature of the evidence and the action of the board of inquiry has this to say:

"We do not assert that all of this evidence would be admissible in a court of law or equity; it is not necessary that it should be. No immigration act could be enforced which required all these facts to be established with the same formality and certainty which is required in the courts. The board had an opportunity to see the relators and to determine by personal observation what manner of men they were. The board knew that they were unable to speak any language known in this country, that only one could read or write, that when the small sums in their possession were exhausted they would starve unless assisted, and that there was no one here under any legal obligation to assist them. The board was also enabled from information derived from the press and other sources to determine the likelihood of the relators securing employment when they reached Portland and was justified in finding that conditions there were such that the chance of employment was most unlikely. It is true that information in this form would not be permitted in a court of law, but the immigration officers cannot delay these proceedings indefinitely. They cannot summon witnesses from the Pacific states or send commissions there. If they were satisfied from information received that there was no market in Portland for such services as these relators could render, they were justified in acting upon such information, just as they would be if satisfied from reports in the press or from any reliable source that Portland had been destroyed by flood or fire or that an epidemic of cholera was raging there. Congress has placed the determination of these questions in the hands of trained officials and their conclusions upon disputed questions of fact are final and conclusive."

We conclude, therefore, that the testimony adduced in the present case was sufficient in character and effect upon which to predicate the findings of the immigration officers, and such findings must be held to be final and conclusive.

Affirmed.