**UNITED STATES ex rel. DIAMOND v. UHL, Acting Immigration Com'r.**

(Circuit Court of Appeals, Second Circuit. May 12, 1920.)

No. 190.

1. Habeas corpus ⬤═92 (1)—Where there is evidence to warrant deportation, court will not weigh it on habeas corpus.

   Where there was evidence to warrant an alien's deportation under Act Oct. 16, 1918 (Comp. St. Ann. Supp. 1919, §§ 4289¼b[1]–4289¼b[3]), on the ground that he advocated unlawful destruction of property, etc., the order of deportation will not be disturbed on habeas corpus, regardless of the weight of the evidence.

2. Aliens ⬤═54—In deportation proceeding, ordinary rules of evidence do not apply.

   In a proceeding under Act Oct. 16, 1918 (Comp. St. Ann. Supp. 1919, §§ 4289¼b[1]–4289¼b[3]), for the deportation of an alien on the ground

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that he advocated the unlawful destruction of property, the ordinary rules of evidence do not apply, and a hearsay affidavit as to alien's statements was admissible.

### 3. Aliens ☞54—Deportation proceedings held not unfair.

Notwithstanding Immigration Law 1917, rule 22, subd. 5, provides that objections and exceptions of counsel shall not be entered in the record and may be presented in an accompanying brief, counsel for an alien, whose deportation was sought under Act Oct. 16, 1918, cannot excuse his failure to request cross-examination of a witness whose affidavit as to the alien's advocacy of unlawful destruction of property was introduced, and where no request for cross-examination was made on hearing or rehearing, the hearing cannot be held unfair because the affiant was not produced.

Appeal from the District Court of the United States for the Southern District of New York.

Application by the United States, on relation of Sonia Diamond, next friend of Rocco Di Blasis, for writ of habeas corpus to be directed to Byron H. Uhl, Acting Commissioner of Immigration at the Port of New York. From an order denying the writ, relator appeals. Affirmed.

Charles Recht, of New York City (Elinor Byrns and David Barr, both of New York City, of counsel), for appellant.

Francis G. Caffey, U. S. Atty., of New York City (David V. Cahill, Sp. Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The petitioner applied for a writ of habeas corpus and alleged that he was being unlawfully detained at the immigration station at Ellis Island, N. Y., and was about to be deported to Italy. A hearing was had before the District Court for the Southern District of New York, and the writ of habeas corpus has been dismissed, and the petitioner remanded to the custody of the acting commissioner of immigration at the port of New York.

It appears that the relator is an alien, a native of Italy, born in 1876, and that he came to the United States in 1901, and declared his intention to become a citizen in 1917. It also appears that he was arrested on July 18, 1919, under a warrant of arrest issued by the Department of Labor which charged "that he advocates the assassination of public officials, and that he advocates the unlawful destruction of property." His arrest was followed by hearings, one on July 23, 1919, and another on September 16, 1919, before the United States immigrant inspector. The inspector at the close of the hearings found the following facts:

"(1) That the said Rocco Di Blasis is an alien, namely, a subject of Italy. (2) That he is in the United States in violation of law in that he is an anarchist, that he believes in or advocates the overthrow by force or violence, of the government of the United States, and that he advocates the unlawful destruction of property. It is recommended that the said Rocco Di Blasis be deported."

The report of the hearings and the findings were submitted to the Department of Labor.

The relator being unable to speak and understand the English language satisfactorily, an interpreter in Italian was sworn, who interpreted all questions asked and answers given at the hearings. The relator was informed at the time that the purpose of the hearings was to afford him an opportunity to show cause why he should not be deported to the country whence he came. He was represented throughout the hearings by counsel, and witnesses called by him were heard.

The arrest of the relator was due to a riot in the city of Rome, N. Y., on July 14, 1919. In June and July there was a strike on among the operatives at certain mills in that city. The petitioner was a restaurant keeper, and apparently not connected with any of the mills. He appears, however, to have been active in the strike, and to have taken part in an attack made on one Spargo, the president and manager of one of the mills, who was assaulted and stabbed while in his automobile. The result was that relator was placed under arrest by the state authorities, charged with two offenses, and was released on bail; $3,000 on one charge and $5,000 on the other charge. An affidavit made by Spargo is in the record, which is as follows:

"James A. Spargo, being duly sworn, says that he is president of the Spargo Wire Company, of Rome, N. Y.; that on July 14, 1919, as he was going down East Dominick street, in the city of Rome, N. Y., in his automobile about 8 o'clock in the morning, a large crowd of people led by Rocco Di Blasis attacked deponent, stopping his automobile and breaking same; that the said Rocco Di Blasis jumped on the running board of said car and stabbed deponent on the arm; that after deponent was stabbed he grabbed his gun, but deponent was overpowered, stabbed, bruised, clubbed, and beaten about the head and body and by the crowd led by Di Blasis; that deponent had been told that he was a marked man and would be killed; that deponent has been told that his house would be blown up, and that the houses and plants of the various manufacturers of the city of Rome would be destroyed, and that the manufacturers themselves would be gotten."

This affidavit was read to relator, and he was asked whether it was true. He denied that it was, and denied that he was leading the crowd, but admitted that he was present. The following is an excerpt from the record:

"Q. Were you present? A. I was.
"Q. Tell me what happened. A. I was present and saw Mr. Spargo with a revolver in his hand, and he shot three times; then for don't let somebody killed I jumped upon his automobile; in meantime he started to shoot me; I give him a punch on the arm and let the revolver knock down. I took the revolver in my hands and I give it away to first man, then I come out of automobile. Mr. Spargo claims I had a knife in my hand, but I did not have anything. If I wanted to hurt Mr. Spargo, I could use his gun on him. I think I save his life."

There is in the record an affidavit from a policeman which is as follows:

"Joseph M. Nero, being duly sworn, says that he was on duty as patrolman on East Dominick street, in the city of Rome, N. Y., on the morning of July 14, 1919, at the time of the riot when Spargo was stabbed; that Di Blasis was the leader of the mob, and opened the door of Spargo's automobile, and

jumped in on Spargo; that deponent saw Di Blasis in the car and pulled him out; that the same morning, previous to the Spargo incident, deponent saw Di Blasis in a trolley car putting people off and insisting that no one could ride on the trolley; that deponent argued with Di Blasis that he had no right to put people off the car, but Di Blasis insisted no one should ride; that deponent arrested Di Blasis, and in searching his residence found I. W. W. literature, consisting of paper, 'Il Nuovo Proletario,' pictures of Rosa Luxemburg and Liebknecht, the speech of Debs at Atlanta prison gates, 'La Russia Socialists,' preamble and constitution and due books of the I. W. W., application blanks for membership, etc.; that deponent has been informed and believes that said Di Blasis has been advocating violence during the strike in the city of Rome during the last two months, and advocating destruction of persons and property, and has been the leader of agitation, and has known of said Di Blasis addressing crowds; that deponent found revolver in the kitchen of Di Blasis residence; that Officer Uhl saw Di Blasis at 3 o'clock one morning during the strike with a baseball bat walking the street; that June 30th, during a riot in the city, Di Blasis was urging and inciting the crowd, by hollering, 'Get um!' 'Get um!' A large quantity of literature was found."

The relator's attention was called to this affidavit and he was asked:

"Q. Is any or all of that true? A. Some is all right. I went up to the street car, I was last one to go in and last one to go out; Nero told me I had no right to ask people if they had a book of the Union. I did not force them; I merely asked for their union card."

"Q. Did you lead that crowd? A. No; I was with the people, but I was not leading them.

"Q. Are you a member of the I. W. W.? A. I was a member, but not now. Now I am a member of the A. F. of L."

The following affidavit was also read to the relator, and he was asked whether the statements it contained were true, and he admitted that they were:

"Joseph Rizzuto, being duly sworn, deposes and says: I am a citizen of the United States, over 21 years of age, residing at 219 East Dominick street, Rome, N. Y., and a merchant at the same address. I know Rocco Di Blasis, and about three days before he was arrested, I called Di Blasis to my place and talked to him. I asked him why he got out early in the morning and went with the crowds; that I had heard that he was causing lots of trouble, talking to these people, getting them excited. I told him he had a wife and children and should not do that, that he should attend to his own business, and that if he did not stop, he would be getting into trouble himself. I gave him advice, and told him not to go out, but to stay at home, and take care of his own business, and stop his noise. I told others the same."

An affidavit was presented at the hearing, made by one Capozzoli, which in part is as follows:

"* * * Di Blasis claims to be a member of the I. W. W. and the chief leader of the organization in the city of Rome. Di Blasis has shown deponent a certificate issued to him in 1917, showing him to be a duly credited representative of the I. W. W. organization, and he is the collector of the dues for said organization in the city of Rome. Di Blasis claims that there are 40 or 50 members of his organization in this city, and that, if this strike situation does not break right in the very near future, it may be necessary for him to take control of the situation with the members of his organization. He is the distributor of a semiweekly publication of the I. W. W. organization, and has also distributed pamphlets containing a speech of Debs made at the threshold of Atlanta prison, a copy of which he gave to deponent. Di Blasis claims that he procured an I. W. W. organizer by the name of Valentine or Valenda to speak in Rome on June 29, 1919, for which he paid $26 out of his

own pocket, and which amount he expects to collect from other members of his organization.

"Di Blasis further stated to deponent that he is not a reformatory Socialist, but he is a revolutionary Socialist, and that he cannot become a citizen of the United States, because of the fact that he is a revolutionary Socialist, and not a reformatory Socialist. Di Blasis further stated that he is a Bolsheviki, and that in the event that the strike is not settled that he shall call for aid on his associates and blow up the shops of the manufacturers; that if the manufacturers don't make some concessions, they had better look out, for their lives will be worth nothing.

"Di Blasis further told deponent that Mr. Debs, who is now held in prison at Atlanta, will become President of the United States at the next election, and that it is a great pity that Ettor is confined at the present time, so that he is unable to come here and take care of the situation, and that he (Di Blasis) is a follower and great believer in Ettor."

The relator was asked as to the above affidavit, and answered as follows:

"Q. Is that all true? A. Nothing true.

"Q. Did you and a friend of yours go to Utica to a meeting, and ask the speaker, one Valenti, to come to speak in Rome? A. Yes, sir; but Valenti is a reformatory Socialist, and not a revolutionist.

"Q. Did you collect money from the other members of the I. W. W. to pay the expenses of his coming? A. Not from the I. W. W., for they were not in existence at that time; I collect from all the people.

"Q. As to your stating to Capozzoli, if the strike is not settled you would call your associates and blow up the shops, did you make that statement? A. No; maybe I say to somebody, 'If they don't get eight hours and better pay, the people gone away from Rome, and Rome will be without labor.'

"Q. Have you ever advocated the destruction of property or lives? A. No, sir; I never did. I don't believe in that.

"Q. Do you own property? A. No; I own the furnishings in my pool room and restaurant and my household effects.

"Q. Have you any money? A. No money in bank.

"Q. Anywhere else? A. No; not a cent.

"Q. Do you own any Liberty Bonds? A. No; I only had $4 paid on the Third Liberty Bond.

"Q. Do you own any W. S. S.? A. No; I sell about $6,000 worth of W. S. S."

The relator's counsel asked him whether he believed in and supported the government of the United States. He replied in the affirmative. He was asked whether he desired to become a citizen of the United States, and answered that he did. He stated that he could read and write in Italian and in English.

At the conclusion of the first hearing relator was remanded to the custody of the sheriff of Oneida county, Rome, N. Y. The evidence taken having been submitted to the Department of Labor, the Acting Secretary of Labor issued his warrant directing that the relator be taken into custody and granted a hearing, to enable him to show cause why he should not be deported.

At the second hearing there was considerable testimony as to the radical class literature found in the relator's possession and admittedly distributed by him. The I. W. W. newspaper, Il Nuovo Proletario, was regularly received by him and distributed. The inspector of immigration, in submitting to the department the record of the supplemental hearing, said:

"A study of 'Socialistic Russia' and of the various articles relating to Russian Bolshevism found in the columns of the New Proletariat leaves no doubt that the American I. W. W. approves of the entire program of the Russian radicals; no doubt that it seeks to spread their doctrine and methods throughout this country and thus to accomplish the overthrow of this government. In fact, we are led to believe that the only difference between the American I. W. W. and Russian Bolshevism is geographical.

"Russian Bolshevism and the American I. W. W. alike disbelieve in government as now organized, and seek to overthrow the same by violence to person and property alike. They are anarchy on an enlarged scale. No man can be a good Bolshevist, or a good I. W. W., without being an anarchist, whether he acknowledges it or not.

"In addition to this general approval of Russian anarchy, we find in the New Proletariat of December 7, 1918, page one, third column, next to the last paragraph, specific sanction of a definite manifestation of domestic anarchy of the deadliest kind—the assassination of seven police officers and the wounding of many others at Haymarket Square in Chicago on May 5, 1887, the perpetrators of which are here affectionately referred to as 'our martyrs,' because some of them were convicted and hanged by due process of law.

"The possession and distribution of this anarchistic literature, membership in the I. W. W., which is hand and glove, if not identical, with Russian anarchy, to say nothing of his acts and words, seem to us to justify the finding that Di Blasis is an anarchist."

[1] The testimony in the record certainly does not disclose that the relator is a desirable personage to have within the limits of the United States. But the government has not given authority to the Department of Labor to cause to be deported aliens who may be regarded as undesirable. The act of Congress under which this deportation proceeding is instituted is the Act of October 16, 1918, 40 Stat. part 1, p. 1012 (Comp. St. Ann. Supp. 1919, §§ 4289¼b[1]–4289¼b[3]). Under that act aliens may be taken into custody and deported who advocate or teach the unlawful destruction of property, as may those who advocate or teach the assassination of public officials. Other classes of aliens may also be deported, but with them we are not concerned at this time. The relator is charged in the warrant for his arrest with being unlawfully in the United States, because he advocated the assassination of public officials and the unlawful destruction of property; and the warrant of deportation simply directs the relator's deportation upon the ground that he advocated the unlawful destruction of property. We are therefore alone concerned with the question whether there is evidence in the record from which the Acting Secretary of Labor could find that the relator did advocate the unlawful destruction of property. In his affidavit Capozzoli swears that the relator told him that he and his associates would blow up the shops of the manufacturers if the strike was not settled. That statement is sufficient evidence to sustain the finding. We have nothing to do with its weight.

[2] It is, however, assigned for error:

"That the court erred in holding that the relator was not given a fair hearing because of the admission of certain hearsay affidavits by one Capozzoli without permitting relator to cross-examine affiant."

The ordinary rules of evidence do not apply to such proceedings as those now under consideration. Sibray v. United States, 227 Fed. 1,

7, 141 C. C. A. 555. The hearsay affidavit of Capozzoli was admissible in the proceedings. Choy Gum v. Backus, 223 Fed. 487, 493, 139 C. C. A. 35; Healy v. Backus, 221 Fed. 358, 364, 137 C. C. A. 166.

[3] It is true that there was no cross-examination of Capozzoli and that he was not produced at the hearing. The defendant, however, did not ask to have him produced, and made no demand for his cross-examination, although represented at the hearing by counsel; and no request was made for any extension of time in which to produce testimony in refutation of the statements in Capozzoli's affidavit. The affidavit was, however, presented at the hearing on July 23, 1919. There was a subsequent hearing, as already stated, on September 16, 1919, when witnesses were called on behalf of the relator; but no attempt was made to discredit the statement quoted from the Capozzoli affidavit, beyond the relator's denial of its truth. The affidavit of the immigrant inspector submitted to the department as respects the second hearing on September 16th was in part as follows:

"Pursuant to your instructions of September 13th, and referring to the above-mentioned files I respectfully report that I gave said Rocco Di Blasis a further hearing on September 16th. I allowed him to obtain witnesses, and I also gave the attorney for said alien the privilege of cross-examination of two of the affiants, Mr. Spargo and Mr. Nero. Mr. Capozzoli, who was a private detective hired by the city of Rome, was not in the city, and I was unable to learn where he was at present. Mr. Searle, the alien's attorney, however, made no request to examine him."

We think that, if possible, Capozzoli should have been present for cross-examination, and his absence is certainly regrettable. But we do not believe that the failure to have him present is sufficient ground for setting these proceedings aside, especially in view of the fact that no demand for his presence and cross-examination was made. The relator knew the contents of the affidavit, and was fully apprised of the evidence against him, and was given an opportunity to call witnesses in his defense, and to offer evidence in explanation or rebuttal. If Capozzoli could not be produced on the day set for the hearing, and relator deemed it important to cross-examine him, he should have made his desire known, and requested that he be produced on some subsequent day. The failure to make the request may, we think, be regarded as a waiver of the right. The fact that the rules of the Bureau of Immigration provide in respect to such hearings that "objections and exceptions of counsel shall not be entered on the record, but may be presented by him in accompanying brief,"[1] does not excuse the failure of counsel to insist that a witness whose affidavit is presented shall himself be produced with a view to his cross-examination. We do not agree with counsel that, because of the rule above referred to, the situation as respects the cross-examination "is exactly the same as if the request had been made and denied"; and we do not agree that the court below should have found that the hearing was unfair.

The order is affirmed.

[1] Rule 22, subd. 5b, Immigration Law 1917.