AMERICAN LINSEED OIL CO. v. FRENCH, Dairy and Food Com'r of Minnesota.

(Circuit Court, D. Minnesota, Third Division. November 25, 1911.)

ADULTERATION (§ 12*)—ADULTERATED PRODUCTS—SUBSTITUTES—EVIDENCE.

Evidence *held* insufficient to warrant a finding that complainant had sold or secured a market for linsol, or a compound of linseed oil sold for what it actually was, but to indicate that complainant had been engaged uniformly in selling such substitutes for pure linseed oil, in violation of Rev. Laws Minn. 1905, § 1772, regulating the selling of such material, and hence complainant was not entitled to an injunction restraining the state food commissioner from instituting proceedings to forfeit shipments of such compounds on the theory that they were useful, beneficial, and valuable commodities and legitimate articles of commerce saleable for what they actually were.

[Ed. Note.—For other cases, see Adulteration, Cent. Dig. §§ 28–30; Dec. Dig. § 12.*]

In Equity. Action by the American Linseed Oil Company against Andrew French, as Dairy and Food Commissioner of Minnesota, to

restrain defendant's enforcement of Rev. Laws Minn. 1905, § 1772, relating to the sale of linseed oil. Bill dismissed.

Mr. Myers, for plaintiff.

Lyndon A. Smith, for defendant.

WILLARD, District Judge.   Section 1772 of the Revised Laws of Minnesota is as follows:

"Pure linseed oil shall be defined as the oil obtained wholly from the seeds of the flax plant and containing no added ingredient. Pure 'boiled' linseed oil is composed wholly of pure linseed oil with so-called dryers added thereto, to an amount not exceeding three per cent. of the total product. Pure linseed oil as distinguished from pure 'boiled' linseed oil shall be known as 'raw' linseed oil. If designed or offered for sale or use as either raw or boiled linseed oil, or as a substitute for either, or in imitation of either, any substance or preparation which is not pure, within the meaning of either of the. above definitions, shall be deemed adulterated and the manufacture or sale thereof is prohibited. No person shall sell either pure raw linseed oil or pure boiled linseed oil, unless each receptacle in which the same is kept for sale or sold, shall have distinctly, legibly and durably painted, stamped, stenciled or labeled thereon the true name of such oil, setting forth in bold-face capital letters not smaller than one inch in length, whether it be 'pure raw linseed oil,' or 'pure boiled linseed oil;' and there shall also appear upon such receptacle the name and address of the manufacturer of such oil."

Upon the first application for a temporary injunction, it appeared that the complainant sold in Minnesota a product which it called linseed oil, which was labeled linseed oil, and which it sold as linseed oil. It further appeared that this article contained less than 70 per cent. of pure linseed oil as the term is defined by article 1772.  I denied the motion for a temporary injunction, and held that the statute of Minnesota was in any event so far valid as prevent transactions of this kind.

Complainant then amended its bill, and alleged (1) that it was engaged in selling pure linseed oil; (2) that among its products was a certain compound of linseed oil labeled "linseed oil," containing less than 97 per cent. of pure linseed oil, which was offered for sale and sold in Minnesota as a substitute for linseed oil; (3) that it has sold in Minnesota a compound under the name of "linsol," so labeled, as a substitute for linseed oil; (4) that it has sold in Minnesota a compound or blend under the name and label of blended linseed oil as a substitute for linseed oil; (5) that the defendant has threatened to seize shipments of this compound while in transit in interstate commerce and in the hands of common carriers; (6) that the defendant threatened to seize this product when within the state; (7) that complainant has built up a large trade in Minnesota in this compound, to be sold as linsol and blended linseed oil; (8) that a large number of its customers in Minnesota would purchase said compound or blend under said names if the defendant did not interfere; (9) that the defendant has seized and confiscated complainant's compound labeled as raw linseed oil and boiled linseed oil; and (10) that said compounds and blends are "useful, beneficent, and valuable commodities, and are legitimate articles of commerce."  A general demurrer to this amended bill was interposed, which I overruled.  Testimony has been taken, a final hearing had, and the case submitted for a decree.

An examination of the evidence shows that no one of the 10 al-
legations of the amended bill above mentioned has been proven.
There is no evidence that the complainant ever sold either in Minne-
sota or elsewhere any pure linseed oil. The testimony of the com-
plainant shows that the only products which it ever sold in Minnesota
were these compounds or blends, none of which contain more than
66 per cent. of linseed oil, and which contain 33 per cent. of mineral
oil. There is no evidence to show that it ever offered to sell or sold
in Minnesota these products as a substitute for linseed oil, or as
blended oil, or as a compound, or as linsol; on the contrary, the evi-
dence is overwhelming that it offered all these compounds and sold
them, not for what they were, but as linseed oil. As has been said,
the largest amount of linseed oil in any of these compounds was 66
per cent.

Concerning the amount of linseed oil in linsol, the complainant's
witness Eddy said, on page 132: "Well, it had some linseed oil in it."
And again, on page 147, the same witness said: "Linsol contains only
a few gallons of linseed oil, * * * 16 to 25 per cent., somewhere
along there." Even the complainant's witnesses had some difficulty
in saying that this article was a substitute for linseed oil. Eddy said
(page 132):

"Q. Were these oils sold as a substitute for the pure linseed oil? A. Why,
they were sold for painting purposes, and to be used for the same thing as
linseed oil, except not for medicinal purposes.

"Q. As to the general appearances of these oils by the side of the pure lin-
seed oil, how did they compare? A. Exactly the same."

Newcomb, the president of the company, testified (page 100) as
follows:

"Q. Is linsol a substitute or imitation of linseed oil? A. Well, it is sup-
posed to be a substitute.

"Q. How is it as to its appearance as to color with that of linseed oil? A.
Well, the color is the same. A person could hardly tell the difference between
that and linseed oil.

"Q. What is it used for? A. It is used for painting purposes."

The complainant does not claim that it ever sold any linseed oil
in Minnesota. The only things which it did sell were these com-
pounds. The record is full of circulars sent to dealers in Minnesota,
some of whom were witnesses for the defendant in the case. These
circulars all offered for sale raw linseed oil and boiled linseed oil.
The words "blended linseed oil" or "linsol" are nowhere found in any
one of these circulars. In no one of them is there any intimation
whatever that the article offered for sale is something that has not
more than 66 per cent. of pure linseed oil in it. The circulars are
so worded as to give the impression that the articles dealt in are all
made from flaxseed, and are pure. The evidence is also abundant to
show that the persons who received these circulars and bought relying
upon them supposed that they were buying pure linseed oil. One
witness said that he thought the complainant was able to quote a
lower price because he claimed that the company did not belong to
the trust. It will only be necessary to cite one instance to show how
unfounded is the allegation of the amended bill that the complainant

193 F.—14

sold these compounds as substitutes for linseed oil, and not as linseed oil itself.

Among the persons who received these circulars was the Charles A. Betcher Lumber Company. Charles A. Betcher, the president, testified for the defendant, and produced one of the circulars and the correspondence (page 429, Def. Rec.), which he had with the complainant after its receipt. The letter of the lumber company to the complainant, ordering oil, is as follows:

"5–6–08.

"American Linseed Oil Co., Omaha, Neb.

"Gentlemen: We have your favor of May 1st, quoting boiled linseed oil delivered here at 39 cents per gallon, and raw at 38 cents per gallon. We assume that you are selling only pure linseed oil, and if you will guarantee your goods to be pure, you may send us one barrel each of boiled and raw at the above named prices, prepaying freight to our station. We note your statement that your goods are guaranteed to give satisfaction or if not satisfactory, they are returnable at your expense.

"Yours very truly,          .     `         Charles Betcher Lumber Co.,
                                             "Chas. A. Betcher."

In response to this letter complainant sent one barrel of raw linseed oil and one barrel of boiled linseed oil. The articles were so described in the bill which was sent to the Betcher Lumber Company. The sending of the oil after the receipt of a letter in which it was stated that the writer assumed that the company was selling only pure linseed oil was an affirmation, as positive as could be made, that the articles sent were pure linseed oil.

As soon as the goods were received, Mr. Betcher wrote to the complainant as follows:

"American Linseed Oil Co., Omaha, Neb.

"Gentlemen: We have received your recent shipment of one barrel each boiled and raw linseed oil, and we find, upon opening these barrels, that these goods are not pure. By referring to our order you will find that we are particular on this point and authorized the shipment only for strictly pure goods and you have sent us something which is adulterated either with neutral oil or some other inferior ingredient. We will hold these two barrels here subject to your order. Please dispose of them elsewhere and let us know at once to whom to make shipment.

"Yours truly,                          Charles Betcher Lumber Company,
                                             "Chas. A. Betcher."

And received in reply the following letter:

"Chas. Betcher Lumber Co., Red Wing, Minnesota.

"Gentlemen: Your favor of the 29th ultimo received and can assure you that it was not wish on our part that goods shipped you May 14th should have proved satisfactory. The instructions given to our works are to be very careful in regard to the quality of goods they shipped our customers so they will have no cause to complain. We will appreciate if you could see your way clear to keep the two barrels. We will be willing to allow you 8 cents a gallon rebate as well as freight.

"Trusting that our proposition is with your approval and that we may have your prompt and favorable reply, we are,

"Yours truly,                          The American Linseed Oil Company,
                                             "W. C. R. Mgr."

The oil sold to Betcher was what the complainant called its regular raw linseed oil and regular boiled linseed oil. After the denial of

the motion for a temporary injunction, the complainant amended its bill so as to allege that it labeled its barrels blended linseed oil and linsol, and sold the compounds as such under those names. Blended linseed oil was identical with its regular raw linseed oil and boiled linseed oil. Linsol has been already described.

It may be said, in the first place, that no linsol was sold in the state of Minnesota, at least neither of the defendants ever had anything to do with that commodity. As to the blended oil, some of it was shipped to the Minnesota Land Company, Brook Park, but no action in regard to that shipment was ever taken by either of the defendants, except that one of their inspectors took samples of it. The other shipment was of two barrels to the Cunningham Mercantile Company. This oil, or a part of it, was confiscated under orders from a state court, and this is the only blended oil as to which either of the defendants have taken any action.

While it must be admitted that the barrels which contained this oil had the word "blended" marked on them rather indistinctly, yet the evidence shows conclusively that the oil was not sold as blended linseed oil, but as linseed oil. Cunningham testified that he ordered from a circular which was similar to the circulars hereinbefore referred to, and that he expected to receive boiled linseed oil which would comply with the laws of Minnesota; that he supposed he had bought pure linseed oil, and that he did not notice the labeling on the barrel until the inspector called his attention to it. He received a bill (page 397) from the Central Linseed Oil Company, for whose acts the complainant was responsible, which described the articles sold as two barrels of boiled linseed oil. The allegation in the amended bill that this blended oil was sold as such and as a substitute for linseed oil is therefore not supported by the evidence. It was proven by the defendants that they had taken no action whatever as to any of the products of the complainant while they were being transported or were in the hands of carriers. It was stated at the hearing by the complainant that there had been no interference by the defendants with interstate commerce. The allegations therefore in the amended bill in that respect are not proven.

While the bill is filled with statements that the defendants have "seized" the property of the complainant, yet the evidence shows that no seizures were in fact ever made by them. Their inspectors obtained samples of the oil generally by buying them. These were analyzed by the state chemists, and the prosecuting officers of the proper district upon being notified of the result commenced proceedings in the proper state courts, where, after a judicial examination and trial, a condemnation was had. The allegations in the amended bill therefore to the effect that the defendants seized the complainant's property are not sustained by the evidence. The complainant not having sold its product as linsol or as blended linseed oil, the allegations in the amended bill to the effect that the company had built up a large trade in these commodities as such is not proven, nor is it proven, as alleged in the amended bill, that its customers in Minnesota would buy the articles under these names, if not interfered with by the defendants.

It is not perhaps necessary to decide whether the allegation in the amended bill that "these articles are useful, beneficent and valuable commodities, and are legitimate articles of commerce," is proven or not. But I may say that upon the evidence I cannot find that allegation to be true. These articles have never been sold upon their merits. They have never been sold for what they really are. The best way to tell whether linsol is a legitimate article of commerce or not is for the complainant to advertise it as a "useful, beneficent, and valuable article to be used for painting purposes and to contain not more than 16 per cent. of linseed oil." If, after such advertisement, complainant builds up a good trade in that commodity, such circumstance might prove that it is a legitimate article of commerce, but no such evidence is found in the present record.

The orator relies to a certain extent upon an allegation in its amended complaint with regard to threats made by the defendants as to what they intended to do with linsol and blended linseed oil. The present dairy and food commissioner, Mr. Winkjer, and he is the only person whose threats are now important, testified (page 88) that he never had in any way interfered with the sale or disposition of linsol or blended linseed oil; and even these threats are of no importance, because the evidence shows that the complainant has never attempted to sell these articles under their appropriate names.

What the orator desires is a decision upon the legal question as to whether the state can lawfully prohibit the sale of an article which is a substitute for some other article admittedly not as good, but still a useful article of commerce. It is well settled that a court is not bound to decide questions in which the complainant has no legal interest. The court is not bound to decide the question argued by the orator until some one presents it who is selling the inferior article as a substitute for the genuine article and as inferior to it. The complainant is not in that class. He has never sold linsol or blended linseed oil as a substitute for linseed oil, but he has sold these articles, so far as he has made any sales at all, as linseed oil. When complainant advertises to its customers in this state that it has for sale for painting purposes an article called linsol which contains only 16 per cent. of linseed oil, and sells it to them as a product containing 84 per cent. of something which is not linseed oil, and when the state dairy and food commissioner interferes with any sales which the complainant may make under these circumstances, the question presented the court will then decide, but not until then.

Let the bill be dismissed, with costs.