MARCELINA FRANQUI DE ALFARO, por y como madre con patria potestad de su menor hijo VICENTE VÉLEZ, demandante, apelante y apelada, *v.* FUERTES HERMANOS, S. EN C., demandada, apelada y apelante.

No. 5655.—*Sometido:* Mayo 2, 1932. *Resuelto:* Marzo 16, 1933.

*García Méndez & García Méndez,* abogados de la apelante apelada; *J. Henri Brown, C. Ruiz Nazario, G. E. González* y *G. Benítez Gautier* (*Salvador Suau* y *F. Prieto Azúar,* en el alegato), abogados de la apelada apelante.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Este caso fué resuelto por sentencia dictada por la Corte de Distrito de Arecibo condenando a los demandados a pagar a la demandante, por vía de indemnización, $2,688, más las costas y gastos del litigio.

Firme la sentencia, la parte victoriosa archivó su memorándum de costas y desembolsos en el que incluyó las siguientes partidas: Honorarios del Márshal, $1; Honorarios del Secretario, $10; Indemnización de testigos, $12; Traslado del Dr. Sánchez de Isabela a Arecibo, $6; Traslado Dr. Cardona de Aguadilla a Arecibo, $6, y Honorarios de abogados, $2,000. Total, $2,035.

La parte vencida aceptó las dos primeras partidas del memorándum e impugnó las restantes, por excesivas. Pidió que los honorarios se fijaran en una suma no mayor de $250.

Oyó la corte a ambas partes y decidió finalmente aprobar íntegras las cuatro primeras partidas del memorándum y rebajar la última a $600.

No conforme la parte demandada, apeló para ante este Tribunal Supremo. La transcripción que ha elevado está formada por copias certificadas por el Secretario de la sentencia que resolvió el pleito, del memorándum de costas y desembolsos, de la impugnación del mismo, de la resolución de la corte y del escrito de apelación y por la transcripción de la evidencia certificada por el taquígrafo y aprobada por el juez sentenciador.

La evidencia aportada por la parte demandada y apelante en la vista del memorándum consistió en la declaración del abogado Fernando B. Fornaris, quien dijo que hizo un ligero examen de los autos del pleito y que a su juicio los honorarios de abogado de la parte demandante valían de $300 a $350. Entonces presentó su evidencia la parte demandante. Introdujo primero el récord taquigráfico del pleito, que no forma parte de la transcripción preparada para este recurso, y luego las declaraciones de los letrados Manuel A. García Méndez y Luis Mercader. El primero actuó como uno de los abogados del pleito. Describe la demanda en la que se re-

clamaron seis mil y pico de dólares, el incidente de traslado que siguió, la moción eliminatoria presentada, las excepciones previas y el juicio que duró "un día desde la mañana temprano hasta cerca de la noche." Dijo que durante el juicio se suscitaron cuestiones de derecho importantes como las que aparecen a las páginas 10, 52, 60, 61, 64 y 73 del récord. Se discutió mucho la lesión del demandante que fué sometido a una hábil operación quirúrgica. El caso fué apelado y confirmada la sentencia por el Supremo. El cliente estuvo como noventa veces en su oficina durante la tramitación del litigio. El bufete dedicó como quince días a la investigación del caso y a su estudio. El abogado Sr. Mercader después de hacer referencia al pleito dijo que a su juicio los honorarios no valían menos de mil doscientos dólares. Volvió a declarar el abogado Manuel A. García Méndez, así:

"Declaro nuevamente que en este caso la parte demandante no convino con sus abogados García Méndez y García Méndez pagar cantidad específica, sino que fueron honorarios eventuales, que estaban sujetos al resultado del pleito, y nosotros cobramos el cincuenta por ciento a que asciende la sentencia con los intereses legales desde la sentencia hasta que se pague, con excepción de que del importe total se sacarían los gastos y honorarios médicos, y de la diferencia la parte demandante nos satisface el cincuenta por ciento.

"A preguntas del Abogado Sr. Prieto Azúar, declaró: P. Iban a partir dentro de las resultancias de eventualidad del pleito?—Sí, señor; honorarios eventuales. Si no ganaba el pleito no ganaba ni un centavo.

"P. Recuerda lo que es el Champerty Common Law, que lo que está prohibido prohibe?—En Puerto Rico no está prohibido.

"P. La ética profesional.—No está en conflicto cuando la legislatura lo ha dicho, como por ejemplo, en casos de indemnizaciones a obreros que la ley dice lo que puede cobrar un abogado, pero en pleitos particulares, como de daños y perjuicios, que están sujetos a contingencias del pleito el resultado definitivo y en ese caso es más que honrado cobrar el cincuenta por ciento de los resultados, y lo hemos hecho porque acostumbramos ser honrados en nuestras actuaciones.

"P. No cree que la práctica en los Estados Unidos se sigue en Puerto Rico, y moralmente le está prohibido a un abogado por hono-

rable que sea, como el compañero, llevar un caso a partir?—Si creyera lo contrario no hubiera aceptado el cincuenta por ciento. Lo acepté de buena fe y porque es honrado y permitido en Puerto Rico hacerlo.''

En su alegato la parte demandada y apelante señala la comisión de cuatro errores. Se refiere el primero a la partida de $12 por indemnización de testigos, el segundo a los gastos ocasionados por el traslado de los médicos y el tercero a la concesión de $600 por honorarios de abogado. El cuarto se formula como sigue:

"La Corte de Distrito de Arecibo, Puerto Rico, cometió manifiesto error al conceder suma alguna por honorarios de abogado.''

No nos detendremos en la consideración de los tres primeros errores. La Corte razonó su resolución, estudiando los hechos del caso a la luz de la jurisprudencia establecida por esta misma Corte Suprema. Nada de ilegal o irrazonable encontramos en sus conclusiones. Además, la parte apelante no ha archivado una transcripción completa de los autos que coloque a esta Corte Suprema en las mismas condiciones que estaba la corte de distrito al dictar la resolución recurrida.

Es el cuarto error el que será discutido en toda su extensión. El señalamiento no está bien formulado. No da por sí mismo una idea de la cuestión que suscita. Sin embargo, se discute luego ampliamente y ampliamente también se rebate por la parte contraria y será considerado. Envuelve la cuestión de *quota litis*.

Resumiendo su argumentación sostiene el apelante que no procede la concesión de honorarios de abogado en este caso:

"(*a*) Porque el artículo 1362 del Código Civil interpretado por la corte de circuito de Boston en el caso de Jones v. Pettingill, 245 F. 269, expresamente prohibe la 'cesión' de algún interés al abogado que interviene en un litigio, y la concesión de honorarios equivaldría a la sanción de tal cesión.

"(*b*) Porque de la transcripción de la evidencia surge claramente en el presente un caso de 'champerty'.

"(*c*) Porque la jurisprudencia americana es uniforme en la repro-

bación de los contratos viciados de 'champerty', así como también la jurisprudencia y los comentaristas españoles, sosteniendo además que la cuestión puede ser suscitada por un tercero tan pronto como de la prueba del caso surja el contrato ilícito.

"(d) Porque es proverbial en la práctica de los tribunales americanos el negarse a oír a una parte que al reclamar un derecho no lo hace recurriendo con las manos limpias.

"(e) Porque el memorándum de costas en el presente caso se basa en una transacción contraria a la más sana tradición jurídica y está doblemente censurada por la ley y por la moral, siendo a un tiempo 'malum prohibitum' y 'malum in se'.''

El pacto de *quota litis* fué considerado ilegal tanto por la legislación española cuanto por la inglesa y americana.

La Ley XIV, tít. VI, de la Tercera Partida, es como sigue:

"LEY XIV.—*Que gualardon deuen auer los Abogados, quando bien fizieren su oficio, e qual pleyto les es defendido, que non fagan con la Parte a quien ayuuan.*

"Reconocer deue la parte del trabajo que lleua el Abogado en su pleyto, quando anda y lealmente, gualardonandole, e pagandol su salario assi como puso con el. E porque los omes, con cuyta que han de vencer los pleytos, e a las vegadas por maestria de los Abogados, prometen, mayores salarios, que non deuen, o fazen posturas con ellos a daño de si; porende mandamos, que el Abogado tome salario de la parte segund el pleyto fuere, grande, o pequeño, e le conuiniere segun su sabiduria, o el trabajo que y lleuare; de manera que el mayor salario, que pueda ser, non suba de cient marauedis arriba, quanto quier sea grande la demanda; e dende ayuso, segun fuere el pleyto. Otrosi defendemos, que ningun Abogado non sea osado, de fazer postura con el dueño del pleyto, de recebir cierta parte de aquella cosa, sobre que es la contienda. Porque touieron por bien los Sabios antiguos, que cuando el Abogado sobre tal postura razonasse, que se trabajaria de fazer toda cosa, por que la pudiesse ganar, quier a tuerto, quier a derecho. E aun lo defendieron por otra razon, porque quando tal pleyto les fuesse otorgado, que pudiessen fazer con la parte a quien ayudassen, non podrian los omes fallar Abogado, que en otra manera les quisiesse razonar, nin ayudar, si non con tal postura; lo que seria contra derecho, e cosa muy dañosa a la gente. Pero si algun Abogado fuesse tan atreuido, que fiziesse tal postura como esta, con la parte a quien ayudasse; mandemos, que despues que le fuere prouado, non pueda razonar por

otri en juyzio, assi como persona enfamada; e demas, que el pleyto, que ouiere puesto con la parte, que non le vala." 3. Los Códigos Españoles Concordados y Anotados, 87.

Y la Ley XXII, tít. XXII, libro V, de la Novísima Recopilación, es como sigue:

"LEY XXII.—*Prohibicion de hacer los Abogados igualas con las partes por razon de ganar el pleyto, ni de seguirlo a su costa.*

"Los mismos en las ordenanzas de Medina de 1489 cap. 56 y 70, y allí cap. 13.

"Mandamos que ningun Abogado pueda hacer partido ni iguala con la parte a quien ayudare, que le dé cierta cantidad de maravedís ni otra cosa alguna por razon de la victoria y vencimiento del pleyto; y qualquier que lo hiciere, sea suspendido del oficio de Abogacía por tiempo de seis meses: y ansimismo que no aseguren a sus partes la victoria de las causas por quantía alguna, so pena de pagar la dicha quantía con el doblo. Y mandamos, que los dichos Abogados ni Procuradores no hagan partido de seguir y fenescer los pleytos a sus propias costas por cierta suma; so pena de cincuenta mil maravedís de cada uno dellos que lo contrario hiciere para nuestra Cámara, y que por el mismo hecho, lo contrario haciendo, incurran en la dicha pena sin otra sentencia. (Ley 8, tít. 16, lib. 2 R.)." 8. Los Códigos Españoles Concordados y Anotados, 96.

El legislador del Código Civil fué menos explícito que el de las Partidas y el de las Recopilaciones. Se limitó a prescribir en su artículo 1459:

"Art. 1459. No podrán adquirir por compra, aunque sea en subasta pública o judicial, por sí ni por persona alguna intermedia:
"1º  *  *  *  *  *  *  *
"2º  *  *  *  *  *  *  *
"3º  *  *  *  *  *  *  *
"4º  *  *  *  *  *  *  *
"5º Los Magistrados, Jueces, individuos del Ministerio fiscal, Secretarios de Tribunales y Juzgados y Oficiales de justicia, los bienes y derechos que estuviesen en litigio ante el Tribunal, en cuya jurisdicción o territorio ejercieran sus respectivas funciones, extendiéndose esta prohibición al acto de adquirir por cesión.

"Se exceptuará de esta regla el caso en que se trate de acciones hereditarias entre coherederos, o de cesión en pago de créditos, o de garantía de los bienes que posean.

"La prohibición contenida en este núm. 5º comprenderá a los Abogados y Procuradores respecto a los bienes y derechos que fueren objeto de un litigio en que intervengan por su profesión y oficio."

Comentando el precepto dice Manresa:

"Se ha discutido si en la incapacidad de los Procuradores y Abogados está incluído el pacto de *quota litis:* Consiste éste, como es sabido, en la estipulación de que el Abogado o el Procurador han de hacer suyos una parte alícuota de la cosa que se litiga, si la sentencia es favorable. Con este concepto a la vista, es para nosotros indudable que el artículo que comentamos no menciona ese pacto; pero como la incapacidad de los Abogados y Procuradores se extiende al acto de adquirir por cesión, y la efectividad del pacto de *quota litis* implica necesariamente una cesión, estimamos que con sólo el núm 5º del artículo 1459 podría pedirse con éxito la nulidad de ese pacto tradicionalmente considerado como ilícito." 10. Manresa. Comentarios al Código Civil, 107.

No opina lo mismo otro gran comentarista español, Scaevola. Expresa:

"Goyena opina que en la prohibición de comprar impuesta a los Abogados va implícita la del llamado pacto de *quota litis,* porque supone la venta o cesión de una parte de la cosa o derecho que es objeto del litigio.

"En igual sentido opinan Baudry Lacantinerie y Leo Saignat, en contra de otros jurisconsultos franceses como Duvergier, Demolombe, Aubry et Rau y Laurent, que atribuyen a dicho pacto causa ilícita; siendo, por tanto, nulo en virtud de otros preceptos del Código Civil.

"    *       *       *       *       *       *       *

"Nos adherimos a la opinión de Laurent y Aubry et Rau, porque la contextura rígida del último párrafo del artículo 1459 presta mucho menos elasticidad de la que se necesita para reputar el pacto de *quota litis* como compra de una cosa o derecho litigioso.

"La coparticipación del paladín en la victoria del vencedor será todo lo inmoral que se quiera, aunque en ello hay mucho de convencionalismo, pero no es caso de compraventa ni de cesión de derechos en litigio." 23, Mucius Scaevola. Código Civil 429, 430.

El artículo 1459 del Código Civil Español es igual al 1348 de nuestro Código Civil Revisado, ed. 1930, 1362 de la edición de 1911. Esta Corte Suprema ha interpretado el precepto en

varios casos, pero en ninguno de ellos se decide directamente la cuestión que aquí se suscita. Ha sido la Corte de Circuito de Apelaciones del Primer Circuito en un caso procedente de la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico, la que ha resuelto algo que es directamente aplicable. Nos referimos al caso de *Jones* v. *Pettingill,* 245 F. 269.

El contrato de que se trataba era como sigue:

"Convengo en pagar a mis abogados, los Sres. Pettingill y Leake, la mitad de lo que yo pueda recibir si la sentencia de la corte me es favorable en un pleito que voy a entablar en la Corte Federal contra Antonio Olivieri, albacea de Félix Olivieri, si dichos abogados pagan todas las costas y desembolsos de dicho pleito y lo tramitan hasta su terminación. En caso de que se llegara a una transacción los abogados recibirán la mitad de cualquiera cantidad que se me pague, en saldo de sus honorarios. De acuerdo con la sentencia de la corte, les pagaré y dividiré con ellos en proporción de la mitad de lo que yo recibiere por orden de la corte."

Y los abogados se comprometieron en él a:

"Nos comprometemos a llevar este pleito a favor de (la referida Adelaida), pagando todas las costas y desembolsos, y tramitándolo hasta su fin, ya por transacción o por sentencia del tribunal."

Siendo su cláusula final:

"Se conviene además que, en caso de transacción, la misma no será válida si no se hiciere en presencia y con el consentimiento y concurso de las dos partes de este contrato."

En el curso de su opinión dijo la Corte de Circuito:

"La cuestión principal que se nos ha planteado no fué suscitada por la contestación a la demanda, ni en momento alguno durante el curso de los procedimientos en la corte de distrito, hasta que Jones alegó en su aludida moción de reconsideración, como motivo para reconsiderar, que la corte de distrito había errado al no sostener que el contrato objeto del pleito era 'contrario a la moral, estaba basado en un convenio para incoar un pleito, (*champertous*), y nulo,' y, por ende, un contrato que no daba derecho a causa de acción alguna. Al denegar la petición, la corte de distrito resolvió, según aparece de su opinión de fecha mayo 29, 1915, que Jones no podía

impugnar la validez del contrato por primera vez después de decreto final, ni en momento alguno 'en que no era parte en el contrato . . .'; y se consideró innecesario discutir su validez. También resolvió que Jones estaba impedido de suscitar la cuestión, por haber aceptado de Pettingill la cantidad requerida para la 'redención' de la participación reclamada por él, según la determinó el perito.

"Las anteriores objeciones a la validez del contrato plantean una cuestión de orden público, que es aparente del récord y no envuelve cuestiones de hechos en disputa. El contrato íntegro fué unido a la demanda, tanto en castellano como en inglés. Si de los autos resulta ser un contrato de tal naturaleza que una corte de equidad no debe prestarse a hacerlo cumplir, las objeciones susodichas van a la base de los derechos alegados en la demanda, y son objeciones que la corte de distrito pudo haber considerado de su propia volición, ya fueran o no sugeridas por las partes, y que pudieron haberse aducido como motivo para impedir que se dictara la sentencia. También hay objeciones que una corte de apelación puede considerar *motu proprio,* ya fueran o no formuladas en la corte inferior. Primeau v. Granfield, 193 F. 211, 114 C. C. A. 549; Griggs v. Nadeau, 221 F. 361, 363, 137 C. C. A. 189. Se dice que no han sido propiamente planteadas por el señalamiento de errores; pero esta corte puede, de conformidad con sus reglas 11 y 25, párrafo 4 (150 F. XXVII, XXXIII, 79 C. C. A. XXVII, XXXIII), considerar a su opción errores claros no señalados, y así lo ha hecho repetidamente.

"Se admite que éste es un contrato que 'pudo ser considerado como basado en un convenio para incoar un pleito, y nulo bajo la antigua ley común'; pero se alega que no hay jurisdicción alguna en que una regla del derecho común no haya sido alterada, variando el grado de la alteración en las jurisdicciones. Asumiremos, en vista de Stanton v. Embrey, 93 U. S. 548, 23 L. Ed. 983, McPherson v. Cox, 96 U. S. 404, 24 L. Ed. 746, Taylor v. Bemiss, 110 U. S. 42, 3 Sup. Ct. 441, 28 L. Ed. 64, Ball v. Halsell, 161 U. S. 72, 80, 16 Sup. Ct. 554, 40 L. Ed. 622, y Nutt v. Knut, 200 U. S. 15, 21, 26 Sup. Ct. 216, 50 L. Ed. 348, que no se ha de declarar nulo o anulable un contrato meramente porque la compensación del abogado se haga depender del éxito o la cantidad recobrada; estando exento, a lo que parece, de fraude, falsas simulaciones o falta de honradez. Las decisiones citadas se refieren a contratos por servicios en la tramitación de reclamaciones contra los Estados Unidos o ante tribunales que actúan bajo la autoridad del gobierno federal.

"Mas el pacto de que los letrados recibirán como honorarios el 50% de la suma que se obtenga, no es el factor más objetable de

este contrato. Éstos convienen en pagar todas las costas y desembolsos del litigio que había en perspectiva y el contrato dispone que ninguna transacción por sus clientes será válida a menos que los abogados estén presentes y presten su consentimiento. Además, aunque no hay una cesión de parte de la señora a ellos, en términos claros, de parte de su interés, ella conviene con ellos, quienes no alegan tener interés alguno en la propiedad, 'en pagar y dividir con ellos la mitad de lo que yo recibiere por orden de la corte.' . . .''

''Puede que haya jurisdicciones en que la legislación local permita alguna de las disposiciones anteriores; mas, hablando generalmente, creemos que es claro que un contrato celebrado por abogado y cliente, relativo a honorarios profesionales que dependan del resultado del litigio, según el cual los abogados convienen en pagar todos los gastos del pleito, tener el dominio de cualquier transacción y estar solidaria e igualmente interesados con el cliente en los bienes envueltos al ser recobrados, es un contrato tan contrario al espíritu de nuestro derecho que una corte de equidad no lo hará cumplir.

'' *         *         *         *         *         *         *         *

''En cuanto a la estipulación tendiente a invalidar cualquier transacción del supuesto litigio por parte del cliente, a menos que ésta fuera hecha en presencia del abogado y con su consentimiento, no podemos vacilar en considerarla como contraria a la política pública y nula por tal motivo. La Corte de Distrito Federal para Puerto Rico así consideró una estipulación a ese efecto, en un contrato similar a éste en muchos respectos, en Rodríguez v. Cueli, 1 Porto Rico Fed. 272, 275. In re Snyder, 190 N. Y. 66, 82 N. E. 742, 14 L. R. A. (N. S.) 1101, 123 Am. St. Rep. 533, 13 Ann. Cas. 441, y Weller v. Jersey City, 68 N. J. Eq. 659, 61 Atl. 459, 66 An. Cas. 442, pueden también ser vistos.

''Si bien la ley local aquí envuelta, o sea la ley de Puerto Rico, trata las cuestiones arriba mencionadas desde un punto de vista distinto, y su política se desprende más bien de códigos que están basados en el derecho civil o en los comentaristas al mismo, que en opiniones publicadas, no hallamos razón alguna para creer que contratos como el que aquí está envuelto, son considerados en Puerto Rico menos detestables a la política del derecho de lo que lo son en los Estados Unidos. Los bien reconocidos fundamentos para creer que de ellos emana un peligro para los intereses públicos, no pueden ser menos fuertes allá que aquí.

''De acuerdo con el artículo 1362 del Código Civil de Puerto Rico de 1902, que suplantó un código anterior que contenía disposiciones similares, los jueces, individuos del ministerio fiscal, secre-

tarios de tribunales y juzgados 'y oficiales de justicia' están impedidos de adquirir por compra los bienes y derechos que estuviesen en litigio ante el tribunal en cuya jurisdicción ejercieren sus respectivas funciones, extendiéndose esta prohibición al acto de adquirir posesión. Esta misma prohibición incluye expresamente 'los abogados respecto a los bienes y derechos que fueren objeto de un litigio en que intervengan por su profesión y oficio.'

"El Código Civil Español contiene prohibiciones similares y los autores españoles convienen en que, de acuerdo con el derecho español, el convenio celebrado por un abogado de incoar un procedimiento por parte de los bienes envueltos, está prohibido y en su consecuencia es nulo."

¿Prohibe la legislación vigente en absoluto el pacto de *quota litis* como lo prohibían Las Partidas y la Nueva y la Novísima Recopilación?

Ya hemos visto que dos grandes comentaristas del Código Civil Español difieren en su criterio sobre el particular. Manresa estima que sí; que no Scaevola. Éste se ajusta a la letra, aquél pretende interpretar su espíritu a la luz de las viejas prescripciones.

Acabamos de ver la interpretación de la Corte de Circuito de Apelaciones del Primer Circuito. Se inclina a la afirmativa, pero lo hace como un argumento más después de haber llegado a la conclusión de que el contrato envuelto en el litigio sometido a su consideración y resolución era nulo por ser contrario a la política pública a virtud de las estipulaciones que lo integraban. Quizá si considerando aisladamente el artículo 1362 del Código Civil que forma parte de las disposiciones relativas al contrato de compraventa, hubiera vacilado en decidir si contiene o no una prohibición absoluta del pacto de *quota litis*. Expresa no la contiene. Implícita quizá, aunque llama mucho la atención que después de existir una legislación expresa tan clara y precisa como la de las Partidas y Recopilaciones, el Código no la siguiera si seguirla en verdad era su propósito. Tal vez el legislador español dejó impreciso su criterio para que fueran las circunstancias especiales de cada caso las que llevaran, como llevaron a la

Corte de Circuito de Apelaciones en el de *Jones* v. *Pettingill,* supra, a declarar la nulidad.

Revisando la jurisprudencia americana encontramos gran número de decisiones que sostiene que no es nulo en sí mismo el pacto por virtud del cual el abogado se aviene a proseguir un litigio y a cobrar por su trabajo si el resultado es favorable un tanto por ciento de lo que obtenga su cliente. Su nulidad depende de las circunstancias concurrentes. Para no alargar indebidamente esta opinión nos limitaremos a citar dos casos de la Corte Suprema de los Estados Unidos, el de *Taylor* v. *Bemiss,* 110 U. S. 42 y el de *Wright* v. *Tebbitts,* 91 U. S. 252.

En el primero, hablando por la Corte, el Juez Sr. Miller se expresó así:

"Aún resta por considerar si en este contrato sobre locación de servicios existe algo que, después de haber sido plenamente cumplido por ambas partes, exija sea declarado nulo por una corte de equidad y que se devuelva el dinero recibido de conformidad con el mismo. En el caso de Stanton v. Embrey, 93 U. S. 548, se resolvió que los contratos celebrados por abogados respecto a honorarios por proseguir reclamaciones contra los Estados Unidos no eran nulos por haberse hecho depender su cuantía del éxito que se pudiera obtener o de la suma que se recobrara. Y las bien conocidas dificultades y demoras en obtener el pago de reclamaciones justas que no están dentro del curso ordinario de los procedimientos de los funcionarios fiscales del Gobierno, justifican que se haga una compensación liberal en aquellos casos en que se tiene éxito, y en que ninguna ha de recibirse en caso de que se fracasase.

"Cualquier otra regla sería muy injusta para con aquellos acreedores de pocos recursos que residen lejos de la capital y que no están en posición de ofrecer dinero ni de prestar su atención personal para garantizar sus derechos.

"Sin embargo, esto no borra la sospecha que naturalmente existe en tales contratos y cuando se puede demostrar que éstos son obtenidos del litigante mediante influencia indebida por parte del abogado contra el cliente o por medio de fraude o dolo o que la compensación es claramente excesiva de tal suerte que equivale a una extorsión, en un caso adecuado la corte protegerá a la parte perjudicada. Si bien el cincuenta por ciento parece ser una suma más

de lo razonable para la división entre abogado y cliente en un caso ordinario, no estamos preparados para asumir que equivalga a una extorsión por esa razón solamente y las declaraciones de los letrados a ese respecto, como peritos, no justifican tal conclusión. En el caso que pende ante nos no hay duda de que los abogados de la Sra. Bemiss no ejercieron influencia alguna sobre ella para obtener los honorarios estipulados en el contrato. Ellos no la habían conocido hasta el momento del pacto y no fué a instancias de ellos o de sus agentes que ella vino a verles. En su primera carta sobre la materia dirigida a los abogados ella les ofrecía el cincuenta por ciento y nada más solicitaron ellos.

"Las declaraciones de dos de los jueces que constituían la corte demuestran que el caso fué difícil y complicado y que tanto Taylor como Wood lo atendieron con tesón y que a él prestaron mucha atención y tiempo y que estuvieron en la corte considerable tiempo.

"Parece probable que la Sra. Bemiss fuera mujer impaciente y poco astuta, mas no hay prueba relativa a tal torpeza de su parte que la incapacite para celebrar un contrato ni el menor indicio de que se obtuviera alguna ventaja de ella en cualquier estado de los procedimientos. Por el contrario, el pago efectuado por los abogados principales de dos quintas partes de los honorarios convenidos por ellos a otros abogados por ella contratados sin consultarles, por los cuales ella era responsable mientras que ellos no lo eran, podrá demostrar lo que se desee menos coerción o conducta opresiva y serviría mucho para mitigar cualquier objeción a que se le dé validez al contrato fundado en la idea de que existe compensación excesiva." Taylor v. Bemiss, 110 U. S. 42, 45.

En el segundo la opinión fué escrita por el Juez Presidente Sr. Waite. Uno de los errores señalados se formula así: "Porque es un contrato basado en un convenio para iniciar un pleito, (because it is champertous), ya que se acordó pagar el diez por ciento de lo que se obtuviera." Discutiéndolo dijo la Corte:

"En Wylie vs. Coxe, 15 How. 415, resolvimos que un convenio en que se acordaba pagar un tanto por ciento razonable de la suma obtenida no era un contrato ilegal. En el presente caso después que se prestaron los servicios y según se exponía después que se había garantizado la reclamación Wright convino en pagar el diez por ciento de la suma que eventualmente se obtuviera como compensación por los servicios prestados. No vemos razón alguna para que

hallemos objeción a esto; y el jurado parece haber adoptado también esta regla, que las partes establecieron para sí mismos, para representar el verdadero criterio para calcular el valor razonable de los servicios prestados.'' Wright v. Tebbitts, 91 U. S. 252, 254.

Parece, pues, que el criterio más justo no es condenar el pacto en sí, sino juzgarlo de acuerdo con las circunstancias que en él concurran. Constituye algo que siempre ha sido mirado con prevención, que debe evitarse, ya que son muchas las razones fundamentales que militan en su contra, pero el legislador moderno enfrentándose abiertamente con la situación, se ha dado cuenta de que existen casos en que la justicia sería difícil que fuera defendida a no ser en esa forma y ha preferido dejar que sean los hechos los que hablen por sí mismos en cada transacción.

Aplicando esa regla, un pacto como el celebrado en el caso de *Jones* v. *Pettingill*, supra, será resuelto siempre en los tribunales puertorriqueños en el sentido de decretar su ineficacia porque allí no sólo se convino en pagar un tanto por ciento, si que además eran los abogados los que sufragaban los gastos del litigio y la parte quedó atada de tal modo que se obligó a no transar sin la intervención y conocimiento de los abogados, pudiendo interpretarse la transacción como una compraventa de bienes en litigio, que es lo que expresamente prohibe el Código Civil. Aquí los hechos sólo demuestran que la remuneración de los abogados estaba sujeta a la suerte que corriera el pleito, fijándose en una cantidad proporcional a la que el demandante obtuviera. No consta que los abogados se comprometieran a pagar los gastos. No aparece que ejercieran indebida influencia con su cliente ni que éste quedara a ellos de tal manera atado que perdiera su libertad de contratación. No hay indicio de fraude alguno. La misma espontaneidad con que el asunto fué revelado por uno de los abogados del demandante después que la parte demandada había admitido en su impugnación que los honorarios valían $250 y su único testigo acababa de declarar que podían tasarse en trescientos o trescientos cincuenta dólares, demues-

tra que se había actuado a las claras, bajo la impresión de que nada contrario a la ley se había hecho.

No satisface en verdad la transacción. El cincuenta por ciento en un caso como el de autos parece excesivo. Es una práctica que no debe tener la acogida favorable de las cortes. La conciencia del juzgador sufre porque quisiera actuar marcando rumbos más en armonía con la justicia como son los de dejar la fijación de los honorarios a la justa apreciación de su valor después de rendidos los servicios cualquiera que fuere la cantidad que se obtenga en el litigio, pero no creemos que atendido el estado de la ley y de la jurisprudencia, los hechos de este caso permitan a la corte rechazar la reclamación de plano por considerar el contrato viciado de nulidad.

El mismo legislador puertorriqueño ha dado su sanción expresa a pactos de *quota litis* al disponer en la sección 49 de la Ley No. 84 de 1928, sobre indemnizaciones a obreros, leyes de 1928, p. 625, 687, que:

"Cualquier contrato, convenio o estipulación que se celebre entre el obrero lesionado o sus herederos de acuerdo con esta Ley, y un abogado, para el pago a éste de honorarios cuya cuantía dependa del resultado del pleito, será nulo y no tendrá fuerza ni efecto legal·a menos que se haga por escrito y sea aprobado por la Comisión Industrial o el juez de la corte correspondiente, según fuere el caso.

"Cualquier convenio para el pago de honorarios a un abogado, de una cantidad que exceda del diez por ciento de la suma obtenida por un obrero como compensación será ilegal y nulo, y el otorgamiento de tal contrato, o el recibo efectivo por dicho abogado de una cantidad que exceda del diez por ciento de la suma obtenida en el juicio, será ilegal y nulo, y constituirá mala conducta por parte del referido abogado, castigable con suspensión o privación del ejercicio de la profesión de abogado, después de incoarse procedimientos adecuados contra el delincuente de acuerdo con las leyes existentes."

Examinada, pues, la cuestión desde sus varios ángulos se concluye que el cuarto error señalado tampoco existe, debiendo en su consecuencia confirmarse la resolución recurrida.

■ También apeló de la resolución fijando los honorarios en seiscientos dólares la parte demandante. En marzo 15,

1932, la parte demandada solicitó la desestimación del recurso basándose en no haberse archivado la transcripción de la evidencia. Se opuso la parte demandante invocando cierta orden de la corte sentenciadora dictada a los efectos de que la misma transcripción sirviera para ambas apelaciones y la cuestión fué resuelta en los términos que constan de nuestra opinión de abril 8, 1932, que obra en el récord.

La parte demandada solicitó reconsideración y ambas partes fueron oídas sobre la moción en el acto de la vista del recurso en su fondo. A virtud de la nueva argumentación de la parte demandada y de un mayor esclarecimiento de los hechos tales como ocurrieron, no habiéndose avenido el demandante a pagar su parte correspondiente en los gastos de la transcripción, precisa concluir que la orden de la corte sentenciadora se dictó sin una base apropiada y no puede favorecer al dicho demandante.

Insistimos en que no deben radicarse transcripciones separadas para apelaciones contra la misma sentencia en que se trata de récords iguales, pero convenimos en que debe existir un acuerdo entre las partes sobre el pago de los gastos. No sería justo imponer a una sola de ellas todo el peso de los mismos.

*En tal virtud, procede la reconsideración, debiendo desestimarse la apelación interpuesta por el demandante por no haberse perfeccionado a tiempo.*

El Juez Asociado Señor Wolf está conforme con la sentencia.